2003 WY 76

**John W. HICKMAN; Fred J. Boyce; and Lane Boyce, Appellants (Defendants),**

v.

**Bernice GROVES; James E. Drake; and Edra June Drake, Appellees (Plaintiffs).**

**No. 02–173.**

Supreme Court of Wyoming.

June 17, 2003.

Cameron S. Walker of Schwartz, Bon, Walker & Studer, LLC, Casper, WY, Representing Appellants. Argument by Mr. Walker.

Kendal R. Hoopes of Yonkee & Toner, LLP, Sheridan, WY, Representing Appellees. Argument by Mr. Hoopes.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This is an appeal from summary judgment entered in favor of appellees Bernice Groves, James E. Drake, and Edra June Drake (collectively appellees) and against appellants John W. Hickman, Fred J. Boyce, and Lane Boyce (collectively appellants). In granting summary judgment, the district court ruled that appellants' predecessors had not reserved any rights to gas, whether from oil or coalbed methane gas (CBM), when they transferred certain real property located in Campbell County to appellees' predecessors. Upon our review, we reverse and remand.

### ISSUES

[¶ 2] Appellants present the following summarized issues:

A. Did the colloquial phrase "oil rights" in the warranty deed unambiguously include or exclude gas?

B. Did the district court err by failing to consider the historical context of the phrase "oil rights" to determine its meaning as used in the warranty deed?

C. Did the district court err when it held that the colloquial terminology "oil rights" was clear, unambiguous, and did not include gas in the warranty deed?

Appellees set forth the issue before this court as:

Does a reservation of "one-half of all oil and commercial gravel rights" in a warranty deed include coalbed methane gas?

### FACTS

[¶ 3] On October 14, 1944, Jerry Hickman and Effie F. Hickman, husband and wife, executed a warranty deed that conveyed to Ed R. Willard real property located in Campbell County but reserved "to the grantors one-half of all oil and commercial gravel rights" in such real property. Appellants are the successors in interest to Jerry Hickman and Effie F. Hickman, while appellees are the successors in interest of Ed R. Willard.

[¶ 4] On July 20, 2001, appellees filed an action seeking to quiet title to all CBM un-

derlying the subject real property. Subsequently appellants filed a counterclaim seeking a judgment that they owned one-half of the gas, including CBM, underlying the involved real property pursuant to the reservation of "oil rights" contained within the warranty deed. Both parties then filed cross-motions for summary judgment. Upon consideration and hearing, the district court entered summary judgment in favor of appellees and against appellants ruling that the warranty deed was unambiguous and that the reservation language of "oil rights" did not reserve any gas rights, including CBM, as a matter of law. This appeal followed.

## STANDARD OF REVIEW

[¶ 5] In *McGee v. Caballo Coal Co.*, 2003 WY 68, ¶ 6, 69 P.3d 908, ¶ 6 (Wyo.2003) (quoting *Garnett v. Coyle*, 2001 WY 94, ¶¶ 3–5, 33 P.3d 114, ¶¶ 3–5 (Wyo.2001)), we again recognized that our standard of review in summary judgment cases is well established.

Summary judgment motions are determined under the following language from W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The purpose of summary judgment is to dispose of suits before trial that present no genuine issue of material fact. *Moore v. Kiljander*, 604 P.2d 204, 207 (Wyo. 1979). Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present. *Weaver v. Blue Cross–Blue Shield of Wyoming*, 609 P.2d 984, 986 (Wyo.1980). A fact is material if proof of that fact would have the

effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1304 (Wyo.2000). The summary judgment movant has the initial burden of establishing by admissible evidence a prima facie case; once this is accomplished, the burden shifts and the opposing party must present specific facts showing that there is a genuine issue of material fact. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987); *Gennings v. First Nat. Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo. 1982).

This Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000) (quoting *Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999)). The record is reviewed, however, from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Garcia v. Lawson*, 928 P.2d 1164, 1166 (Wyo.1996).

## DISCUSSION

[¶ 6] Appellants argue the district court erred by not considering the historical context and rural background of the makers of the warranty deed. Essentially, they argue that the use of the words "oil rights" in 1944 by landowners in rural Wyoming included "gas" rights. They further assert this conclusion is supported by the fact that the Petroleum Ownership Map Company and previous owners of the land assumed that appellants continued to possess rights in the gas.[1] Appellants also argue that in the 1940s gas was not produced separately from oil

---

1. Evidence within the record establishes that the Petroleum Ownership Map Company and previous owners of the land may have understood the language of the reservation clause within the warranty deed to include both oil and gas. Yates Petroleum Corporation, Yates Drilling Company, ABO Petroleum Corporation, MYCO Industries, Inc., and Phillips Petroleum Company were also added as defendants in the Amended Complaint filed in this action because they claimed an interest in oil and gas leases covering the subject real property. However, these defendants are not directly involved in this appeal.

and, therefore, these rights were considered, as a practical matter, inseparable. In response, appellees primarily argue that the words used within the warranty deed are unambiguous and there is clearly a distinction between "oil" and "gas." Further, appellees claim that extrinsic evidence cannot be utilized because no ambiguity in the warranty deed language exists. We do not agree.

"According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." *Amoco Production Company v. EM Nominee Partnership Company,* 2 P.3d 534, 539–40 (Wyo.2000) (citations omitted).

Assignments are contracts and are construed according to the rules of contract interpretation. The determination of the parties' intent is our prime focus in interpreting or construing a contract. If an agreement is in writing and its language is clear and unambiguous, the parties' intention is to be secured from the words of the agreement. When the agreement's language is clear and unambiguous, we consider the writing as a whole, taking into account relationships between various parts. *In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract.* *Boley v. Greenough,* 2001 WY 47, ¶¶ 10–11, 22 P.3d 854, ¶¶ 10–11 (2001) (some citations omitted). Although substantial disagreement exists over the meaning of the deed, neither party suggests the language of the deed is ambiguous. Differing interpretations of contracts alone do not constitute ambiguity requiring extrinsic evidence. *Moncrief v. Louisiana Land and*

*Exploration Company,* 861 P.2d 516, 524 (Wyo.1993).

We must first examine the terms of the deed and give them their plain and ordinary meaning. *Wolter v. Equitable Resources Energy Company, Western Region,* 979 P.2d 948, 951 (Wyo.1999); *Pete Lien & Sons, Inc. v. Ellsworth Peck Construction Co.,* 896 P.2d 761, 763 (Wyo. 1995). Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Moncrief,* 861 P.2d at 524.

*Newman v. RAG Wyoming Land Co.,* 2002 WY 132, ¶¶ 11–12, 53 P.3d 540, ¶¶ 11–12 (Wyo.2002) (emphasis added). *See also McGee,* ¶ 11 and *Wadi Petroleum v. Ultra Resources, Inc.,* 2003 WY 41, ¶ 11, 65 P.3d 703, ¶ 11 (Wyo.2003).

[¶ 7] We also recognized in *Newman,* at ¶¶ 19 and 27, as well as *McGee* at ¶ 11, when faced with circumstances like those present here, we must focus on the general intent of the parties, concentrating on the purpose of the grant in terms of the respective manner of enjoyment of surface and mineral estates and the exploitation of the mineral resources involved. It reasonably follows that a similar review must be made when considering the general intent of the parties when reservations of rights are involved.

[¶ 8] In *Newman* and *McGee,* we determined, after careful consideration of the historical development of the commercial capture of CBM, that those involved parties in 1973 and 1974 clearly could not have intended CBM to have been treated separately from oil and gas. We reached this conclusion in part because the value of CBM only became known long after the conveyance through the discovery of new methods for its capture and changes in economics making its collection profitable. Therefore, given the surrounding facts and circumstances which existed at the time of the execution of the warranty deeds in those cases, we concluded that the parties had no specific intent to convey rights in CBM separately from oil and gas because those granting parties would have been wholly unaware that CBM was of any value. Again, in the early 1970s, the

separate production of CBM did not occur. Rather, CBM was then a useless waste by-product and possible hazard of coal excavation. *See Newman,* at ¶¶ 6–8; *McGee,* at ¶¶ 21–23.

[¶ 9] Upon reviewing the language utilized in the conveyances made in *McGee,* this court noted the McGees expressly conveyed good and merchantable title to the lands involved "together with all coal and all other minerals, metallic or non-metallic, contained in or associated with coal and which may be produced with coal" owned or held by the grantors in those lands. These warranty deeds also reserved to the grantors "all oil, gas and other minerals in said lands" which the grantors then owned, "other than those included above in the conveyance to Grantee." Applying the same reasoning as in *Newman,* we therefore concluded the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property. As we expressed in *Newman* at ¶ 32 (emphasis added):

> *On the basis of the unambiguous language of the deed and the surrounding facts and circumstances,* we conclude the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property. By this ruling, we do not intend to imply that, in all circumstances, the conveyance of coal excludes the conveyance of the coalbed methane. Parties can certainly sever the coalbed methane from the remainder of the oil and gas estate and convey it separately. Such an explicit severance occurred in this case when the oil and gas lessee vertically segregated its oil and gas leasehold interest and assigned from the surface to 1,000 feet beneath the surface, which contained the coal seam, to Hi–Pro. However, the warranty deed from the landowners to the coal operator in this case, which conveyed "all coal and minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal oper-

ations" but reserved all oil and gas, did not accomplish such a segregation.

[¶ 10] The language of the warranty deed in this case conveyed the real property but reserved to the grantors "one-half of all oil and commercial gravel rights" in that real property. This situation is far different than the circumstances faced by this court in either *Newman* or *McGee* because no specific grant of coal or specific reservation of gas was expressed by the grantors. To the contrary, the utilization of the term "oil rights," in and of itself, in the reservation clause of the warranty deed, at a time when gas was produced only in conjunction with oil, casts doubt on the true intent of the grantors with regard to the gas. Therefore, we hold that a genuine question of material fact exists and that the granting of summary judgment was inappropriate.

[¶ 11] We acknowledge that the district court's ruling in this matter is based on the ultimate conclusion that in determining whether a deed is ambiguous, and if so, in determining its meaning, an objective test must be applied. The basic tenet of such test is that the intent of the grantor must be decided solely from the words used and no venture into the area of extrinsic evidence, including the circumstances surrounding the making of a contract, can be made unless an ambiguity exists within the document itself. However, we do not believe that this accurately reflects the status of the law in Wyoming, particularly as it is applied to contracts involving mineral interests. In addition to the authorities cited above, we agree with the opinion issued by the Colorado Supreme Court in *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769, 776–77 (Colo.1985) (citations omitted and emphasis added):

> [T]he intent of the parties to a written instrument must be determined primarily from the written terms. "It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties." Whether an ambiguity exists, as a matter of law, is for the court

to determine. *In making this determination, the court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract.* However, the court may not consider the parties' own extrinsic expressions of intent.

[¶ 12] We further find appropriate those statements found at 11 Samuel Williston, *A Treatise on the Law of Contracts,* § 32:7 (4th ed.1999) (footnotes omitted):

In theory, the circumstances surrounding the execution of a contract may always be shown and are always relevant to a determination of what the parties intended by the words they chose. In construing a contract, a court seeks to ascertain the meaning of the contract at the time and place of its execution. Thus, although the parties may not, because of the parol evidence rule, testify as to agreements they made before or contemporaneously with the execution of the contract, the circumstances surrounding the execution of the contract bear upon the contract's meaning. Some courts, not fully appreciating the distinction between the rule that permits evidence of the surrounding circumstances to be considered, and the rule which prohibits the introduction of evidence of collateral agreements, have held that the former rule runs afoul of the latter, the parol evidence rule. Indeed, pronouncements can be found in numerous cases to the effect that evidence of the circumstances surrounding the execution of a contract may be admitted, like any other parol evidence, only where the contract's meaning is ambiguous. These decisions in truth, reflect a misunderstanding both of the scope and purpose of the parol evidence rule, and the meaning of the phrase "surrounding circumstances;" "surrounding circumstances" do not embrace either the prior or contemporaneous collateral agreements of the parties or their understanding of what particular terms in their agreement mean. Rather, the term refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties. Such matters as, for example, whether one or both parties was new to the trade, whether either or both had counsel, and the nature and length of their relationship, as well as their age, experience, education and sophistication would all be part of the "surrounding circumstances," admissible, if relevant, notwithstanding the parol evidence rule.

[¶ 13] Williston also teaches, in addressing the subject of proof of usage for the purpose of defining words in a contract, at Volume 12, § 34:5 that:

Historically, it has been recognized that familiar words may have different meanings in different places and that every contract will therefore have a relation to the custom of the country where it is made. . . .

. . . [I]n subsequent years, numerous cases were decided where words with a clear normal meaning were shown by usage to bear a meaning which was not suggested by the ordinary language used. This is not only true of technical terms, but of language which, at least on its face, has no peculiar or technical meaning or significance.

Therefore, evidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract where other parol evidence would be inadmissible. Thus, circumstances known to the parties at the time they entered into contract, such as what that industry considered to be the norm, or reasonable or prudent, should be considered in construing a contract, while the parties' statements of what they intended the contract to mean are not admissible.

It is currently the widely-accepted rule that custom and usage may be proved to show the intention of parties to a written contract or other instrument in the use of phrases of a peculiar technical meaning which, when unexplained, are susceptible of two or more plain and reasonable constructions. Parol evidence may be admitted to establish a technical meaning where certain provincialisms and technicalities of science and commerce have acquired a

known, fixed and definite meaning different from their ordinary meaning by legal custom or usage. Thus, in the interpretation of technical terms used in a contract, it is proper to consider the meaning given to those terms in the course of prior dealings between the parties, as well as by business or trade custom or usage....

. . .

It has also been said that usage is admissible to explain what is doubtful but never to contradict what is plain. If this statement means that usage is not admitted to contradict an apparently plain meaning if proof of the usage were excluded (and this is what the statement seems naturally to mean), it is inconsistent with many decisions and incorrect on principle. Consequently, the correct rule with reference to the admissibility of evidence as to trade usage under the circumstances presented here is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are considered to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, since, by reason of the usage, words are used by the parties in a different sense.

[¶ 14] Appellants, in opposition to the motion for summary judgment filed by appellees and in support of their own motion for summary judgment, submitted the affidavits of Arch W. Deuel, John P. Dever, David F. Dick, F.H. Merback, Clinton C. Putnam, Robert J. Scheeler, Thomas F. Stroock, and Johny W. Mullinnix, each "landmen" working in the area of oil and gas leases with substantial past experience in the Rocky Mountain Region. These affidavits each provide testimony that in the early 1950s and prior it was common for rural residents to refer to "oil rights" when referring to both oil and gas

rights, without differentiating between the two substances. Appellants also submitted the affidavit of John W. Hickman which detailed the somewhat meager educational background and simple ranch related living and business conditions experienced by his father and mother, Jerry Hickman and Effie F. Hickman, the grantors of the warranty deed, as well as the ranching related life and business background of Ed R. Willard, the grantee of the warranty deed. Appellees, in support of their motion for summary judgment, submitted the affidavit of Dr. Anthony W. Gorody, an expert in oil and gas development. This affidavit sets forth testimony that the terms "oil" and "gas" and other terms have well known meanings in the oil and gas industry along with the historical background concerning the commercial development of CBM. Simply put, these affidavits raise a material question of fact as to the actual meaning of the words "oil rights" as used within the warranty deed and whether those rights were intended to include both "oil and gas rights," either including or excluding CBM, or conversely solely oil with no attendant "gas rights" of whatever nature.

[¶ 15] Finally, appellees argue there is a difference between "gas" associated with oil and "gas" not associated with oil, such as coalbed methane gas. Appellees also contend that natural gas was well recognized as a valuable resource independent from oil at the time of the warranty deed. Therefore, had the grantors truly intended the result furthered by appellants, they would have so specified. By asserting these very arguments, appellees admit that a question of material fact exists as to whether or not the grantors intended to entirely convey all gas, in whatever derivative, to the grantee or intended to reserve one-half an interest in such gas. In addition, by proffering their latter contention that natural gas was a well recognized valuable commodity separate from oil at the time of the warranty deed, appellees have essentially invited review of the historical circumstances that existed at that time. It would be patently unfair to review only those historical contexts set forth by appellees in support of their arguments while refusing to do so with respect to those

facts put forth by appellants in providing foundation for their arguments.

## CONCLUSION

[¶ 16]   We hold that the district court improperly determined that summary judgment should be granted to appellees.  The record before us presents issues of material fact. This matter is, therefore, reversed and remanded for further proceedings consistent with this opinion.