2012 WY 49

**ECOSYSTEM RESOURCES, L.C.,**
Appellant (Defendant),

v.

**BROADBENT LAND & RESOURCES,
LLC, Appellee (Plaintiff),**

and

**South & Jones Timber Company, Inc.,**
Appellee (Involuntary Plaintiff).

No. S–11–0143.

Supreme Court of Wyoming.

April 5, 2012.

Representing Appellant: Phillip William Lear of Lear & Lear, LLP, Salt Lake City, UT; James S. Lowrie; and Nathan D. Thomas of Jones Waldo Holbrook & McDon-

ough, PC, Salt Lake City UT. Argument presented by Mr. Lowrie.

Representing Appellees: Anna Reeves Olson and Weston W. Reeves of W.W. Reeves, Casper, WY; Mark W. Gifford of Gifford & Brinkerhoff, Casper, WY; and Clayton Thomas, Evanston, WY. Argument presented by Mr. Gifford.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

HILL, Justice.

[¶ 1] This is the second time the present case has been appealed to this Court. In the first appeal, we reversed a judgment on the pleadings and remanded for proceedings to examine the facts and circumstances surrounding Union Pacific's reservations of timber in deeds from the early 1900s in order to determine the parties' intent with regard to the duration of the timber estates. *Ecosystem Resources, LC v. Broadbent Land & Resources, LLC,* 2007 WY 87, 158 P.3d 685 (Wyo.2007) (*Ecosystem I*). After a bench trial, the district court concluded "in using the term 'timber,' Union Pacific intended to reserve only those trees (1) in existence at the time of the grant and (2) of sufficient size to be suitable for use in construction." The district court also concluded from the facts and circumstances that the parties intended Union Pacific to have a reasonable time to harvest the timber from the encumbered properties. It ruled that Union Pacific's timber reservations had expired because the reserved timber was no longer located on the properties and, in any event, more than a reasonable time had passed. The district court also ruled, in the alternative, that Broadbent had acquired title to the timber by adverse possession. It, therefore, granted judgment in favor of the surface owner, Broadbent Land & Resources, LLC[1] and against the timber estate owner, Ecosystem Resources, L.C.

[¶ 2] Resolving Ecosystem's appeal, we conclude that the district court properly ruled, on the evidence before it, that Union Pacific intended its reservation of "timber" to include only trees of a suitable size which existed on the subject properties at the time of the deeds. The evidence presented at trial clearly established that such timber no longer exists on the properties. Consequently, we affirm the district court's order granting judgment in favor of Broadbent.

## ISSUES

[¶ 3] Ecosystem raises the following issues on appeal:

1. Whether the trial court erred in concluding that the facts and circumstances surrounding the deeds at issue [dated] 1906, 1908 and 1909 indicate an intent of the parties to those deeds to limit the duration of the timber reservation set forth therein.

2. Whether the trial court erred in finding that [Broadbent] had removed timber on disputed lands for a period sufficient to support a finding of adverse possession.

Broadbent offers a more detailed statement of the issues:

1. Whether the district court's finding that the facts and circumstances surrounding the execution of the timber deeds demonstrated an intent to limit the duration of the timber reservation to a reasonable time was clearly erroneous.

2. Whether the district court's finding that the timber reservations applied only to timber existing at the time of the deeds was clearly erroneous.

3. Whether the district court erred in construing the deeds against the drafter.

4. Whether the district court erred in considering the subsequent conduct of the parties.

5. Whether the district court's findings that Broadbent proved the elements of adverse possession [were] clearly erroneous.

1. Involuntary plaintiff South & Jones Timber Company, Inc. had an agreement with Broadbent to purchase and harvest the "mature timber" on its property.

## FACTS

[¶ 4] In 1862, Congress passed an act authorizing organization of the Pacific railroad companies. In that legislation, the federal government provided land grants and credit to induce railroad companies to construct a transcontinental railroad. Union Pacific was established to undertake that effort and received a large grant of land in Wyoming. In the 1890s and early 1900s, Union Pacific sold some of its Wyoming property to private persons. Union Pacific included timber reservations in some of its land contracts and deeds.

[¶ 5] This case involves timber reservations in three Union Pacific deeds from the early 1900s.[2] The earliest was a 1906 warranty deed from Union Pacific to James Graham for 634 acres in Uinta County, Wyoming for which he paid $463. The deed stated, in relevant part:

> Excepting and Reserving to said Union Pacific Railroad Company, its successors and assigns, the exclusive right to cut and remove timber from said land and the right to ingress, egress and regress upon said land and the right to use as much of the surface thereof as may be necessary for the proper conduct of said business thereon.

[¶ 6] In 1908, Union Pacific executed a deed granting 15,941 acres in Uinta County to Heber Land and Livestock Company in consideration for $7,970.57. The deed contained the following pertinent language:

> Excepting and reserving to Union Pacific Railroad Company, the exclusive right to cut and remove all timber from said lands and the right of ingress, egress and regress upon said land, and the right to use so much of the surface thereof as may be necessary for the proper conduct of said business thereon.[3]

[¶ 7] In 1909, Union Pacific executed a deed conveying 5,037 acres to James Ches-

ney in exchange for $3,779.52. The deed excepted and reserved to:

> Union Pacific Railroad Company, its successors and assigns, all timber on said lands, and the exclusive right to cut and remove the same from said lands and the right of ingress, egress and regress upon said lands, and the rights to use so much of the surface thereof as may be necessary for the proper conduct of said business thereon.

[¶ 8] In 2005, a dispute arose between Broadbent, the successor in interest to each of the grantees of the surface estate, and Ecosystem, the successor in interest to Union Pacific's timber interests. Initially, the district court granted Broadbent's motion for a judgment on the pleadings, holding as a matter of law that the timber reservations were limited to a reasonable time because Union Pacific did not expressly state in the deeds that the reservations were perpetual. *Ecosystem I*, ¶ 1, 158 P.3d at 686. The district court based this ruling on what it concluded was a majority rule across the country. *Id.*, ¶ 21, 158 P.3d at 691. Ecosystem argued that it should have been allowed to present evidence about the facts and circumstances surrounding the execution of the deeds to inform the court as to the parties' intent with regard to the timber interests. *Id.*, ¶ 7, 158 P.3d at 687. This Court agreed, citing our deed interpretation rule that facts and circumstances evidence is available to help determine the plain meaning of the deed language even if such language is not ambiguous on its face. *Ecosystem I*, ¶¶ 9–10, 158 P.3d at 688.

[¶ 9] In *Ecosystem I*, we acknowledged existing authority stating that timber reservations were understood to include a reasonable time limitation. We, however, eschewed a formalistic rule based upon such case law and held that facts and circumstances evidence should be consulted to determine the parties' general intent regarding the duration

---

**2.** In the initial appeal, only the Heber and Chesney deeds were considered. *Ecosystem I*, ¶¶ 4–5, 158 P.3d at 687.

**3.** The following statement was included at the end of the Heber deed, above the signatures: "The nineteenth line from the top was erased

before the execution and delivery of these presents." The "erased" line included part of the timber reservation. Since a determination of whether the timber reservation was actually erased would not affect our decision, we will not further discuss this matter.

of the timber estates. Appropriate facts and circumstances evidence could include case law interpreting timber reservations and conveyances from the same era as the Union Pacific deeds, the nature of the parties, the type of land covered by the deeds, the purposes of the conveyances and/or reservations, the railroad's use of timber in its business activities, and the consideration paid by the surface owners for the conveyances. *Id.*, ¶¶ 34–36, 158 P.3d at 693–94.

[¶ 10] Upon remand, the district court held a bench trial and considered facts and circumstances evidence in accordance with our direction. The court concluded the facts and circumstances demonstrated that, by using the term "timber" in the reservations, Union Pacific intended only to reserve the trees, then in existence, which were of sufficient size to use in its railroad operations. The district court further concluded the facts and circumstances established that Union Pacific was limited to a reasonable time to remove the timber. In the alternative, the district court ruled that Broadbent had obtained title to the timber estate by adverse possession. Ecosystem appealed.

### STANDARD OF REVIEW

[¶ 11] Because the case was tried to the court, we apply the following standard of review:

> Following a bench trial, this court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan*, 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there

is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Piroschak*, ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004). Further,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*Id.*

*Pennant Service Co., Inc. v. True Oil Co., LLC*, 2011 WY 40, ¶ 7, 249 P.3d 698, 703 (Wyo.2011), quoting *Hofstad v. Christie*, 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010) (some citations omitted). The district court's conclusions of law are subject to our *de novo* standard of review. *Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009).

### DISCUSSION

[¶ 12] Before we begin our analysis of the district court's decision in this case, we will review a few underlying principles. As we have stated countless times, deeds are contracts and we employ our typical contract interpretation principles to interpret them. *Gilstrap v. June Eisele Warren Trust*, 2005 WY 21, ¶ 12, 106 P.3d 858, 862 (Wyo.2005). Given that deeds are contracts,

> [o]ur deed interpretation rules focus on deriving the intentions of the parties. *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 22, 126 P.3d 909, 919 (Wyo.2006); *Caballo Coal Co. v. Fid. Exploration & Prod. Co.*, 2004 WY 6, ¶ 11, 84 P.3d 311, 314 (Wyo.2004). We start with the language utilized by the parties to the deed, giving that language its plain and ordinary meaning. *Hickman v. Groves*, 2003 WY 76, ¶ 6, 71 P.3d 256, 258 (Wyo.2003). If the language is clear and unambiguous, we look only to the "four corners" of the deed in ascertaining the parties' intent. *Caballo Coal*, ¶ 11, 84 P.3d at 314.

However, we have also recognized that, even if a contract is unambiguous, we can examine evidence of the circumstances surrounding the execution of the deed to arrive at the parties' intent. *Hickman*, ¶¶ 6–11, 71 P.3d at 257–58. Relevant considerations may include the relationship of the parties, the subject matter of the contract, and the parties' purpose in making the contract. *Id.*

*Ecosystem I*, ¶¶ 9–10, 158 P.3d at 688 (footnote omitted). *See also, Davidson Land Co. v. Davidson*, 2011 WY 29, ¶ 14, 247 P.3d 67, 71–72 (Wyo.2011). Facts and circumstances evidence is used as an aid in discerning the plain meaning of the language used in the deeds. "Plain meaning" is defined as the meaning the " 'language would convey to reasonable persons *at the time and place of its use.*' " *Newman v. RAG Wyoming Land Co.*, 2002 WY 132, ¶ 12, 53 P.3d 540, 544 (Wyo. 2002), quoting *Moncrief v. Louisiana Land and Exploration Company*, 861 P.2d 516, 524 (Wyo.1993) (emphasis added).

[¶ 13] An interesting thing happened in this case on remand. After we stated that it was improper to rely solely upon case law which suggested that timber interests are limited to a reasonable time without engaging in a search for Union Pacific's general intent, the parties focused on the actual language used in the reservations and presented evidence pertaining to the plain meaning of the word "timber." The evidence included dictionary definitions and case law from the same era as the deeds, as well as other facts and circumstances evidence.

[¶ 14] We have used similar analyses to determine the plain meaning of terms used in conveyances in other cases. In *Boley v. Greenough*, 2001 WY 47, 22 P.3d 854 (Wyo. 2001), for example, we considered facts and circumstances evidence to determine what the parties intended when they used the term "overriding royalty" in assignments of mineral interests more than 30 years earlier. We consulted evidence demonstrating that the meaning of the term had changed over time, the nature of the grantors' mineral interests, the history of oil and gas development on the property, and the fact that the parents assigned the interests as gifts to their children immediately after discovery of oil and gas on their land. Looking at that facts and circumstances evidence, this Court held that the contract language indicated the parties intended to create perpetual nonparticipating royalties. *Id.*, ¶¶ 13–23, 22 P.3d at 858–60.

[¶ 15] Similarly, in *Hickman v. Groves*, 2003 WY 76, 71 P.3d 256 (Wyo.2003) and *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, 126 P.3d 909 (Wyo.2006) we stated that facts and circumstances evidence could be used to determine what the parties meant by the term "oil rights" in a deed executed in Campbell County in the 1940s. Hickman offered evidence that the parties used the term "oil rights" to mean "oil and gas" rights. The facts and circumstances evidence considered included the nature of the parties (ranchers with limited education), typical use of terms such as "oil rights" in casual versus formal contexts at the time of conveyance, and the nature of the petroleum industry at the time of execution (i.e., gas was seen as an unwanted byproduct of oil production). *Mullinnix*, ¶¶ 13–20, 126 P.3d at 916–19.

[¶ 16] Consistent with this precedent, the district court in the case at bar analyzed the various forms of evidence and authorities presented to determine the meaning of the term "timber" as used in the Union Pacific deeds and made the following findings of fact:

### The Meaning of the Word Timber

58. In these deeds, Union Pacific was reserving to itself those things that would be useful to maintain and operate a railroad. It was iron, coal and timber. It is not reasonable to conclude that Union Pacific was intent on picking huckleberries or pruning shrubs or saplings too small to use for building purposes. "Timber" in this case meant those trees that are suitable for use in the erection of buildings or in the manufacture of tools, utensils, furniture, carriages, fences, ships and the like. The word does not denote trees which are suitable only for firewood or cordwood. *E.g. Lord v. Meader*, 73 N.H. 185, 60 A.2d [A.] 434, 436 (N.H.1905). Here, it would

mean trees suitable for railroad ties or mine tresses and timbers or lumber for building construction.

### What is Timber?

59. Case law in existence at the time the deeds in this case were executed defined timber similarly. *See Keeton v. Audsley*, 19 Mo. 362, 1854 WL 4569 (Mo. 1854) ("The word 'timber,' in common parlance, is applied to standing trees, and to the wood proper for buildings, utensils, furniture, ships, etc. Yet, in law, timber means certain trees useful for building, or the like."); *Babka v. Eldred* [47 Wis. 189], 2 N.W. 102 (Wis.1879) ("*[t]imber* means the body, stem or trunk of a tree, or the larger pieces o[r] sticks of wood which enter the frame-work of a building or other structure. See Webster's Dic."); *Bustamente v. U.S.* [4 Ariz. 344], 42 Pac. 111 (Ariz.Terr.1985) [ (Ariz.Terr.1895) ] ("As a generic term, [timber] properly signifies only such trees as are used in building ships or dwellings."); *Lui [Liu] Kong v. Keahialoa* [8 Haw. 511], 1892 WL 1096 (Hawaii 1892) (" 'Timber' trees are defined to be those which can be used for building purposes, furniture, etc."); *Dickinson v. Jones* [36 Ga. 97], 1867 WL 1475 (Ga.1867) ("Timber is used technically to denote green wood of the age of twenty years or more, such as oak, ash, elm, beech, maple, and with us would include walnut, hickory, poplar, cypress, pine, gum and other forest trees."); *Wilson v. State* [17 Tex.App. 393], 1885 WL 6725 (Tex.Ct.App.1885) (approving a jury instruction defining timber as "that sort of wood which is proper for building, or for tools, utensils, furniture, carriages, fences, ships, and the like, usually said of fallen trees, but sometimes of those standing."); *Lord v. Meader* [73 N.H. 185], 60 Atl. [A.] 434 (N.H.1905) ("In this country the term 'timber,' when applied to standing trees, generally means such as are suitable for use in the erection of buildings or in the manufacture of tools, utensils, furniture, carriages, fences, ships, and the like." The court distinguished between "timber" and "growth," the latter being "plainly generic in meaning, and would include all wood upon the lot.")

60. Just as the foregoing cases establish the proposition that a reservation of timber applies only to trees in existence, further analysis reveals that trees must be of a certain size before they are considered timber. For instance, the New Dictionary of the English Language (1839) defined "timber" as "Trees supplying wood for building; the thick stem or trunk." Similarly, the Exposition of the English Language (1819) defined "timber" as "Wood fit for building; the main trunk of a tree * * *." Webster's American Dictionary of the English Language (1889) defined "timber" in relevant context as "That sort of wood which is proper for buildings or for tools, utensils, furniture, carriages, fences, ships and the like; usually said of felled trees, but sometimes of those standing."

61. It is reasonable to conclude, thus, that in using the term "timber," Union Pacific intended to reserve only those trees (1) in existence at the time of the grant and (2) of sufficient size to be suitable for use in construction. The testimony presented at trial was that in order to be considered merchantable, i.e., suitable for commercial use, at the time of the deeds in question, trees must have a diameter of at least nine inches. Union Pacific's reservation of timber was limited to trees at least nine inches in diameter. It did not include aspen, for which there was no commercial market at the time.

62. There was no evidence that the trees presently existing would have been of merchantable size on the dates of the deeds in question. In fact, Defendant's forestry expert did not find any trees that had even been sprouted on the dates of these deeds. Regardless if the reservation[s] in the deeds are interpreted to apply to all trees in existence on the date of the conveyances in question, or only to those of merchantable size, there are no trees fitting either definition in existence at present.

63. The cases cited by the Wyoming Supreme Court in support of the proposition that "a timber interest that is not expressly limited in time continues in perpetuity," 158 P.3d at 691, do[ ] not alter the conclusion that Union Pacific's timber res-

ervation applied only to trees in existence at the dates of the deeds.... *Walters v. Sheffield,* 75 Fla. 505, 78 So. 539 (1918); *Butterfield Lumber Co. v. Guy,* 92 Miss. 361, 46 So. 78 (1908); *R.M. Cobban Realty Co. v. Donlan,* 51 Mont. 58, 149 P. 484, 487 (1915); and *Magnetic Ore Co. v. Marbury Lumber Co.,* 104 Ala. 465, 16 So. 632 (1894). None of these cases state that the perpetual right included cutting trees not yet in existence. The *Walters, Magnetic Ore* and *R.M. Cobban Realty Co.* cases were expressly limited to timber in existence at the time of the grant.

[¶ 17] Based upon these findings, the district court rendered the following conclusions of law:

12. According to Thompson [on Real Property], "Timber as used in timber deeds and contracts refers to standing trees." He later states "Distinction is made between a conveyance of 'timber' and of 'timber rights.' All of the vendor's rights cease when the merchantable timber is removed. But 'timber rights' permits the harvesting of successive crops of timber as they mature." Thompson on Real Property, § 99.

13. In this case [Ecosystem] reserved ["]timber["] and the right to cut and remove such in the Graham deed and "the right to cut and remove timber" in the Chesney and Heber deeds. Using Thompson's analysis, [t]imber meant the standing trees in 1906 through 1909 when the deeds were made. Those trees have long since died. By implication, [Ecosystem's] right to them died with them or would expire once the trees were harvested if still alive because "timber rights" were not reserved.

[¶ 18] To reiterate, in *Ecosystem I* we directed that the district court consider relevant facts and circumstances evidence which could include case law interpreting timber reservations and/or conveyances from the same era as the Union Pacific deeds, the nature of the parties, the type of land covered by the deeds, the purposes of the conveyances and/or reservations, Union Pacific's use of timber in its business, and the consideration paid by the surface owners for the conveyances. *Id.,* ¶¶ 34–36, 158 P.3d at 693–

94. As the district court noted, the trial evidence established that Union Pacific had specific uses for wood products, including railroad ties, mine timbers and supports, building construction, railroad cars, trestles, charcoal and fuel. Union Pacific's purpose in reserving the timber, then, was to secure appropriate timber resources to meet those specific needs.

[¶ 19] The trial evidence established that the principal species of trees suitable for commercial purposes on the Broadbent land is lodge pole pine. One of Ecosystem's expert witnesses, Wesley Rickard, who was a forestry consultant in forest management policy and economics, testified that merchantable timber in 1910 included only trees of at least nine inches in diameter. As such, Union Pacific intended to reserve trees of that size in order to meet its needs.

[¶ 20] Also in accordance with our instructions on remand, the district court properly reviewed case law and reference materials of the same vintage as the deeds at issue here. Based upon its extensive review of source materials, the district court concluded that the term "timber" was widely used at the time of the deeds to mean currently existing trees of a particular size and did not typically include future growth. The district court appropriately considered Union Pacific's purposes in reserving the timber, the nature of the property and timber resource and contemporaneous definitions and case law in making its determination about what the parties meant by the term "timber" in the reservations. Its conclusion that Union Pacific intended to reserve then-existing trees of sufficient size on the property is clearly supported by the evidence.

[¶ 21] Ecosystem criticizes the district court's ruling, stating that it conflicts with our decision in *Ecosystem I,* where we noted that mineral interests are "perpetual" in nature and stated that "unless the facts and circumstances surrounding execution of the Union Pacific deeds suggest otherwise, there is no reason to treat timber interests differently than mineral interests." *Ecosystem I,* ¶ 26, 158 P.3d at 692. That statement was made in the context of the issue presented in the first appeal—whether a judicially created

rule of reasonable time limitation on timber interests should be imposed without distilling the parties' intent from the facts and circumstances surrounding execution of the deeds. The district court's ruling in this case does not contradict that holding. It considered the facts and circumstances, together with the prevailing definition of "timber" in deeds and reference books from the relevant time period, and concluded that Union Pacific intended only to reserve the then-existing timber which would suit its purposes. The district court did not, as Ecosystem asserts, impose a rule without giving due regard to the parties' intent.

[¶ 22] In some cases, a determination that a deed reserved the then-existing timber would still require examination of the time for removal of the timber, i.e., whether the timber interest holder had an unlimited amount of time or only a reasonable time to remove the timber; however, that issue is not present here. Ecosystem's own expert, Mr. Rickard, testified that he had sampled trees on the Broadbent properties and did not discover any trees that would have been alive at the time the deeds were executed. He agreed that "any merchantable timber in 1910 would have died by normal progression of the forest." Our agreement with the district court's determinations that Union Pacific only intended to reserve the then-existing timber and such timber no longer exists is dispositive of this appeal.

[¶ 23] Nevertheless, the district court also ruled that, based upon the facts and circumstances surrounding execution of the deeds, it was clear the parties intended that Union Pacific only had a reasonable time to remove the timber, and a reasonable time had "passed by any measure decades ago." The facts and circumstances examined by the district court in making that determination also confirm the district court's other holding—that Union Pacific only intended to reserve the then-existing trees.

4. Broadbent was successful at casting doubt on Ecosystem's expert witnesses' opinions by presenting evidence that Ecosystem's attorneys had intentionally withheld information that was potentially damaging to its case from the experts.

[¶ 24] Ecosystem's experts opined that in the early 1900s there was a general fear about a possible timber famine and, consequently, Union Pacific adopted policies to assure "its access to wood products as far into the future as it could." They claimed that Union Pacific "adopted strict policies concerning reserving timber rights when it sold portions of its forested lands." The experts maintained that these policies clearly demonstrated Union Pacific's intent to reserve a perpetual interest in successive crops of timber.[4]

[¶ 25] Broadbent presented evidence which contradicted the experts' opinions. Many of the properties sold by Union Pacific during the relevant period were sold pursuant to 10–year installment land contracts, and numerous such contracts were admitted into evidence at trial. The contracts contained provisions forbidding the buyers from removing timber from the properties during the pendency of the contracts. The relevant provisions stated:

> *Third.* That all timber growing upon the land shall be allowed to remain there and shall not be cut, removed or destroyed except so far as may be necessary for the construction of improvements upon said land ... until final payment for said land[.]

That provision indicates clearly that Union Pacific did not want any timber removed (except for the construction of improvements on the property) while the property was still under contract and the possibility of forfeiture existed. A few of the installment land contracts also included the following provision typed in the margin:

> It is also agreed that all timber upon said land shall remain the property of [Union Pacific], and [Union Pacific] shall have the exclusive right to cut and remove the same.

As the district court noted, the vast majority of the contracts only limited the grantees' rights to the timber during the pendency of the contract. Thus, this evidence directly

The district court accepted some of the experts' statements about factual matters, but ruled their ultimate opinions were not persuasive because they were based on skewed information.

opposed Ecosystems' experts' opinions that Union Pacific adopted a strict policy of reserving the timber on properties it sold during the relevant time period.

[¶ 26] The trial evidence also included documentation of two different transactions involving Union Pacific and grantees of the surface estate of former railroad lands. This evidence was gleaned from old court files and the records of attorney P.W. Spaulding which are part of the collection of the American Heritage Center at the University of Wyoming in Laramie.

[¶ 27] One transaction involved a conflict which began in 1913 over the continued validity of a timber reservation by Union Pacific in a 1906 deed given to Taylorsville Livestock. The Taylorsville deed timber reservation was identical in all material respects to the reservations in deeds at issue here:

> Excepting and reserving to said Union Pacific Railroad Company, its successors and assigns ... [t]he exclusive right to cut and remove timber from said land and the right of ingress, egress and regress upon said land and the right to use so much of the surface thereof as may be necessary for the proper conduct of said business thereon.

[¶ 28] The internal correspondence between Union Pacific attorneys included the following statements:

> In the case of Taylorsville Company against Union Pacific, we submitted the law question to Mr. Loomis at Omaha, citing authorities. He agrees with me that our contract and deed do not reserve title to the timber, but only the right to enter the lands and cut the timber. This being true under the authorities cited to him, and under those you have, we would be obliged to cut the timber within a reasonable time or lose our rights. Mr. Loomis directs that we shall not incur the expense of a trial.

A few days later, Union Pacific changed its litigation stance, which was noted in the following statement:

> I am in receipt of a telegram from Mr. Loomis directing us to proceed and try the case of Taylorsville Livestock Company v. Union Pacific.... The letter I wrote you on the 28th inst. you may disregard therefore, and we will get ready to try the case if it is not continued.

There is no record of the outcome of any trial on the matter.

[¶ 29] The Union Pacific attorney specifically stated that the contract and deed did not reserve the title to the timber, only the right to enter the lands and cut the timber, and that the timber had to be cut within a reasonable time. This correspondence is completely consistent with the notion that Union Pacific only reserved the then-existing timber. Had Union Pacific retained the timber in perpetuity, including future growth, it would have stated that it had title to the timber and would not have been concerned about the passage of time. As noted by the district court, the fact that Union Pacific changed its litigation strategy does not alter its original conclusion about the meaning of the reservation. It simply meant that it intended to try the case on the basis of whether or not a reasonable time had passed.

[¶ 30] The other transaction involved Heber Livestock, although it did not pertain to the Heber deed specifically at issue in this case. Mr. Spaulding wrote to Union Pacific on behalf of Heber Livestock in 1907, seeking permission to use the timber located on two properties, which were still under contract and no deeds had issued, to construct improvements to the properties.

[¶ 31] In response, the Union Pacific land commissioner referred to the contracts on each parcel—one which involved the standard installment contract and one which reserved "the exclusive right to cut and remove the timber from said land" and stated that "[t]he exceptions, reservations, covenants and conditions herein above written shall each be written into the conveyance of the said premises which may hereafter be made and shall run with the land." The land commissioner gave permission for Heber Land to cut timber on the land covered by the standard contract, but stated that the timber on the land covered by the contract with the "exclusive right" to the timber was "absolutely reserved" to Union Pacific and "must not be cut either before or after the lands are deeded."

[¶ 32] Ecosystem argues that the Heber/Union Pacific correspondence demonstrates that, when Union Pacific included a timber reservation in a deed, it intended an "absolute reservation" which, according to Ecosystem, meant more than the timber existing at the time of the contract. Like the district court, we disagree with Ecosystem's interpretation of these documents. The correspondence merely demonstrates the distinction between the typical installment contracts, which limited timber cutting until the contracts were fully paid, and contracts in which Union Pacific reserved an interest in the timber beyond the final payment of the contract. In addition, the contract with the "exclusive right" language also stated that the corresponding deed would include a provision making the timber reservation "run with the land." The deeds in the present case do not contain any "running with the land" language. The Heber/Union Pacific correspondence does not support Ecosystem's argument that the deeds at issue here should be interpreted as reserving all timber and future growth, in perpetuity.

[¶ 33] Consistent with our instructions in *Ecosystem I*, the district court also compared the consideration paid for properties with timber reservations and properties without such reservations and found:

> 17. The evidence at trial indicated that the price for the land sold by Union Pacific to the original purchasers, i.e., seventy-five cents ($.75) an acre for the Graham and Chesney tracts and fifty cents ($.50) for the Heber lands did not differ from the purchase price paid for other lands sold by Union Pacific during that period for grazing land when no timber rights were reserved.

This finding is confirmed by the installment land contracts admitted into evidence at trial. As such, the consideration paid indicates that Union Pacific did not reserve an interest in the future growth of timber which would perpetually encumber the surface of the properties, making it less valuable to the surface land owners.

[¶ 34] The district court properly considered the facts and circumstances surrounding execution of the deeds. Its determination that the evidence established that Union

Pacific used the word "timber" in the reservations to mean the then-existing trees of sufficient size is not clearly erroneous or inconsistent with the law. Because the undisputed evidence established that such timber no longer exists on the property, we affirm the district court's order granting judgment in favor of the surface owner, Broadbent.

Our affirmance of the district court's ruling that "timber" did not include future growth is dispositive. Consequently, we do not need to address Ecosystem's other arguments, including the district court's rulings as to: Broadbent's adverse possession claim; whether the expert witnesses should have been allowed to testify on Union Pacific's intent with regard to a reasonable time limitation on the timber interests; whether the deeds were ambiguous concerning a reasonable time limitation; and whether it was appropriate to apply rules of construction. Affirmed.