2004 WY 6

**CABALLO COAL COMPANY, a Delaware Corporation, Appellant (Defendant),**

v.

**FIDELITY EXPLORATION & PRODUCTION COMPANY, a Delaware Corporation, Appellee (Plaintiff),**

and

Marion Jankowski; The Catherine L. Demchock Family Mineral Trust Dated 9–25–01; Charles Irwin Jenkins; Patricia Marie Stricker; Donald Ray Jenkins, Appellees (Defendants).

No. 03–91.

Supreme Court of Wyoming.

Feb. 10, 2004.

Representing Appellant: Dan B. Riggs and Michael C. Steel of Lonabaugh and Riggs, Sheridan, WY. Argument by Mr. Steel.

Representing Appellee Fidelity Exploration: S. Thomas Throne of Throne & Hurst, Sheridan, WY.

Representing Appellee Jankowski: Lynn M. Smith of Hart & Beisher, Sheridan, WY.

Representing Appellees Jenkinses and Stricker: Clay B. Jenkins, Sheridan, WY. Argument by Mr. Jenkins.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1]   This is an appeal from summary judgment entered in favor of appellees Marion Jankowski, the Catherine L. Demchock Family Mineral Trust dated 9/25/01, Charles Irwin Jenkins, Patricia Maria Stricker, and Donald Ray Jenkins (collectively appellees) and against appellant Caballo Coal Company (CCC).   In granting summary judgment, the district court ruled that appellees' predecessors had not conveyed the rights to coalbed methane gas (CBM) when they transferred certain rights in real property to CCC's predecessors.   We reverse.

## ISSUES

[¶ 2]   Appellant sets forth the following issue:

> Do warranty deeds that grant "all minerals contained in or associated with" coal, without any reservation, convey the Grantors' interest in coalbed methane?

Appellees style the issue on appeal as:

> Do 1975 deeds that grant coal "[t]ogether with all of grantors' undivided interests in and to all other minerals, metallic or non-metallic contained in or associated with the deposits of coal conveyed hereby or which may be mined and produced with said coal, subject to the reserved royalty hereinafter provided" convey gas as well, simply because the gas reservoir is in the coal formation?

Appellee, Fidelity Exploration & Production Company (FEPC), who initiated this action as an interpleader pursuant to W.R.C.P. 22 does not set forth an issue on appeal.

## FACTS

[¶ 3]   On January 8, 1975, Theresa Scullen and Annie Jenkins issued a warranty deed to

the Carter Oil Company conveying specific interests in land located near Sheridan, Wyoming (Scullen deed). Three days later, Elizabeth C. Lynch also issued a warranty deed to the Carter Oil Company conveying specific interests in land located near Sheridan, Wyoming (Lynch deed).

[¶ 4] Both the Scullen and Lynch deeds set forth, in applicable part:

GRANTOR ... CONVEYS AND WARRANTS to THE CARTER OIL COMPANY, GRANTEE, ... all of GRANTOR'S undivided interest in and to the coal upon and within and underlying the following described lands situate in the County of Sheridan, State of Wyoming....

TOGETHER WITH all of GRANTOR'S UNDIVIDED interest in and to all other minerals, metallic or nonmetallic, contained in or associated with the deposits of coal conveyed hereby or which may be mined and produced with said coal, subject to the reserved royalty hereinafter provided.

The warranty deeds both also provided that the grantors would be paid certain royalties with respect to the coal mined from the property. However, the grantors did not reserve any other interests in the subject land in either of the deeds.

[¶ 5] Appellees are the successors in interest to Theresa Scullen, Annie Jenkins, and Elizabeth C. Lynch under the Scullen and Lynch deeds. CCC is the successor in interest of Carter Oil Company under the Scullen and Lynch deeds. FEPC acquired oil and gas leases from CCC and appellees, which cover lands including those which are specified in the Scullen and Lynch deeds, and currently produce CBM from coal seams located on the land.

[¶ 6] On May 22, 2002, FEPC filed a complaint for interpleader asking the district court to determine who was entitled to receive royalty payments on the production of CBM. Upon cross-motions, the district court entered summary judgment in favor of appellees and against CCC. This appeal followed.

### STANDARD OF REVIEW

[¶ 7] We have often stated our well-established standard of review for summary judg-ments. In *McGee v. Caballo Coal Co.*, 2003 WY 68, ¶ 6, 69 P.3d 908, ¶ 6 (Wyo.2003) (quoting *Garnett v. Coyle*, 2001 WY 94, ¶¶ 3–5, 33 P.3d 114, ¶¶ 3–5 (Wyo.2001)), we stated:

Summary judgment motions are determined under the following language from W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The purpose of summary judgment is to dispose of suits before trial that present no genuine issue of material fact. *Moore v. Kiljander*, 604 P.2d 204, 207 (Wyo. 1979). Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present. *Weaver v. Blue Cross–Blue Shield of Wyoming*, 609 P.2d 984, 986 (Wyo.1980). A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1304 (Wyo.2000). The summary judgment movant has the initial burden of establishing by admissible evidence a prima facie case; once this is accomplished, the burden shifts and the opposing party must present specific facts showing that there is a genuine issue of material fact. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987); *Gennings v. First Nat. Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo. 1982).

This Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000) (quoting *Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999)). The record is reviewed, however, from the vantage point

most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Garcia v. Lawson*, 928 P.2d 1164, 1166 (Wyo.1996).

*See also Hickman v. Groves*, 2003 WY 76, ¶ 5, 71 P.3d 256, ¶ 5 (Wyo.2003).

### DISCUSSION

[¶ 8]  The underlying facts and the main issue presented in this case are very similar to those that existed in the cases of *Newman v. RAG Wyoming Land Co.*, 2002 WY 132, 53 P.3d 540 (Wyo.2002) and *McGee*, previously determined by this court.  In both *Newman* and *McGee* we considered whether CBM had been conveyed by 1970 deeds conveying the surface of certain property and "coal and minerals commingled with [the] coal" and reserving all "oil, gas, and other minerals" not otherwise conveyed.  *Newman*, at ¶¶ 1 and 3–5, and *McGee*, at ¶¶ 3–5.  Recently, in *Hickman*, we considered whether CBM had been reserved by landowners who in 1944 conveyed rights in land but reserved "one-half of all oil and commercial gravel rights" and, in doing so, clarified the principles we employ when interpreting such conveyances.

[¶ 9]  Our analysis in *Newman* and *McGee* began by setting forth the historical background of CBM. This court recognized that for over a century CBM had been well known and had long been considered a dangerous waste product of coal mining.  However, in the 1970s the value of CBM was realized resulting in concerted research and development in the area.  In the early 1990s techniques were perfected for the efficient development of CBM. Prior to this time, CBM was simply allowed to escape from the coal in the course of open pit surface mining, and no attempt was made to capture it as a valuable resource. *Newman*, at ¶¶ 6–8, and *McGee*, at ¶ 8.

[¶ 10]  Further in *Newman* and *McGee*, we noted the chemistry and composition of CBM. CBM is chemically identical ($CH_4$) to gas produced through conventional methods, and both CBM and gas produced from conventional methods are known as "natural gas."  Natural gas emanates from the decay of organic material over time under great pressure and temperature.  CBM gas exists in coal in three basic states: as free gas, as gas dissolved in the water in coal, and as gas "absorbed" on the solid surface of the coal. *Newman*, at ¶¶ 9–10, and *McGee*, at ¶ 9.[1]

[¶ 11]  Finally, this court concluded that the ultimate issue to be resolved in *Newman* and *McGee* was whether the parties to the deeds in question intended CBM to be conveyed along with the coal estate or reserved to the grantor as part of the oil and gas estate.  *Newman*, at ¶¶ 11 and 14; *McGee*, at ¶ 10.  As explained in *Hickman*, in making our determinations in these cases, we apply the following standards:

> "According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them.  When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties.  In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." *Amoco Production Company v. EM Nominee Partnership Company*, 2 P.3d 534, 539–40 (Wyo.2000) (citations omitted).
>
> Assignments are contracts and are construed according to the rules of contract interpretation.  The determination of the parties' intent is our prime focus in interpreting or construing a contract.  If an agreement is in writing and its language is clear and unambiguous, the parties' intention is to be secured from the words of the agreement.  When the agreement's language is clear and unambiguous, we consider the writing as a whole, taking into account relationships between various parts. *In interpreting*

---

1.  Many of these facts are also established in this case through the affidavit of Anthony W. Gorody, an earth science professional, proffered by CCC in support of its motion for summary judgment and the affidavit of Jimmy Goolsby, a consulting geologist, submitted by appellees in support of their summary judgment motion.

*unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract.*

*Boley v. Greenough*, 2001 WY 47, ¶¶ 10–11, 22 P.3d 854, ¶¶ 10–11 (2001) (some citations omitted). Although substantial disagreement exists over the meaning of the deed, neither party suggests the language of the deed is ambiguous. Differing interpretations of contracts alone do not constitute ambiguity requiring extrinsic evidence. *Moncrief v. Louisiana Land and Exploration Company*, 861 P.2d 516, 524 (Wyo.1993).

We must first examine the terms of the deed and give them their plain and ordinary meaning. *Wolter v. Equitable Resources Energy Company, Western Region*, 979 P.2d 948, 951 (Wyo.1999); *Pete Lien & Sons, Inc. v. Ellsworth Peck Construction Co.*, 896 P.2d 761, 763 (Wyo. 1995). Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Moncrief*, 861 P.2d at 524.

*Hickman*, at ¶ 6 (quoting *Newman*, at ¶¶ 11–12 with emphasis added). *See also McGee*, at ¶ 11 and *Wadi Petroleum, Inc. v. Ultra Resources, Inc.*, 2003 WY 41, ¶ 11, 65 P.3d 703, ¶ 11 (Wyo.2003). When faced with determining the meaning of the language used within deeds, we focus on the general intent of the parties, concentrating on the purpose of the grant in terms of the respective manner of enjoyment of surface and mineral estates and the exploitation of the mineral resources involved. *Hickman*, at ¶ 7 (citing both *Newman*, at ¶¶ 19 and 27, and *McGee*, at ¶ 11). We additionally interpret the terms used within the documents at issue by giving the words used their plain and ordinary meaning to reasonable persons at the same time and place of their use. *Hickman*, at ¶¶ 8–9. Thus, we have consistently applied a historical context analysis. In fact, in *Hickman*, at ¶¶ 11–13, we went even further to explain:

In addition to the authorities cited above, we agree with the opinion issued by the Colorado Supreme Court in *KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769, 776–77 (Colo.1985) (citations omitted and emphasis added):

> [T]he intent of the parties to a written instrument must be determined primarily from the written terms. "It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties." Whether an ambiguity exists, as a matter of law, is for the court to determine. *In making this determination, the court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract.* However, the court may not consider the parties' own extrinsic expressions of intent.

We further find appropriate those statements found at 11 Samuel Williston, *A Treatise on the Law of Contracts*, § 32:7 (4th ed.1999) (footnotes omitted):

> In theory, the circumstances surrounding the execution of a contract may always be shown and are always relevant to a determination of what the parties intended by the words they chose. In construing a contract, a court seeks to ascertain the meaning of the contract at the time and place of its execution. Thus, although the parties may not, because of the parol evidence rule, testify as to agreements they made before or contemporaneously with the execution of the contract, the circumstances surrounding the execution of the contract bear upon the contract's meaning. Some courts, not fully appreciating the distinction between the rule that permits evidence of the surrounding circumstances to be considered, and the rule which prohibits the introduction of evidence of collateral agreements, have held that the former rule runs afoul of

the latter, the parol evidence rule. Indeed, pronouncements can be found in numerous cases to the effect that evidence of the circumstances surrounding the execution of a contract may be admitted, like any other parol evidence, only where the contract's meaning is ambiguous. These decisions in truth, reflect a misunderstanding both of the scope and purpose of the parol evidence rule, and the meaning of the phrase "surrounding circumstances;" "surrounding circumstances" do not embrace either the prior or contemporaneous collateral agreements of the parties or their understanding of what particular terms in their agreement mean. Rather, the term refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties. Such matters as, for example, whether one or both parties was new to the trade, whether either or both had counsel, and the nature and length of their relationship, as well as their age, experience, education and sophistication would all be part of the "surrounding circumstances," admissible, if relevant, notwithstanding the parol evidence rule.

Williston also teaches, in addressing the subject of proof of usage for the purpose of defining words in a contract, at Volume 12, § 34:5 that:

Historically, it has been recognized that familiar words may have different meanings in different places and that every contract will therefore have a relation to the custom of the country where it is made. . . .

. . . [I]n subsequent years, numerous cases were decided where words with a clear normal meaning were shown by usage to bear a meaning which was not suggested by the ordinary language used. This is not only true of technical terms, but of language which, at least on its face, has no peculiar or technical meaning or significance.

Therefore, evidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract where other parol evidence would be inadmissible. Thus, circumstances known to the parties at the time they entered into contract, such as what that industry considered to be the norm, or reasonable or prudent, should be considered in construing a contract, while the parties' statements of what they intended the contract to mean are not admissible.

It is currently the widely-accepted rule that custom and usage may be proved to show the intention of parties to a written contract or other instrument in the use of phrases of a peculiar technical meaning which, when unexplained, are susceptible of two or more plain and reasonable constructions. Parol evidence may be admitted to establish a technical meaning where certain provincialisms and technicalities of science and commerce have acquired a known, fixed and definite meaning different from their ordinary meaning by legal custom or usage. Thus, in the interpretation of technical terms used in a contract, it is proper to consider the meaning given to those terms in the course of prior dealings between the parties, as well as by business or trade custom or usage. . . .

. . .

It has also been said that usage is admissible to explain what is doubtful but never to contradict what is plain. If this statement means that usage is not admitted to contradict an apparently plain meaning if proof of the usage were excluded (and this is what the statement seems naturally to mean), it is inconsistent with many decisions and incorrect on principle. Consequently, the correct rule with reference to the admissibility of evidence as to trade usage under the circumstances presented here is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are considered to

have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, since, by reason of the usage, the words are used by the parties in a different sense.

As in *Newman, McGee,* and *Hickman,* we must also apply the above-cited standards in determining whether the parties to the deeds in question here intended CBM to be conveyed along with the coal estate.

▪ [¶ 12] CCC begins its argument by placing emphasis on the fact that both the Scullen deed and Lynch deed explicitly provide for the conveyance of the grantors' *"undivided* interest in and to *all other minerals, metallic or nonmetallic, contained in or associated with the deposits of coal* conveyed hereby *or* which may be mined and produced with said coal." Hence, CCC argues that the language contained within the Scullen and Lynch deeds clearly expresses the parties' intent that *all* minerals, like CBM, be conveyed to the grantees. CCC further asserts that under our holdings in *Newman* and *McGee,* we must conclude in this case that, as a matter of law, CBM is a mineral contained in or associated with coal, and CBM was therefore conveyed by the Scullen and Lynch deeds.

▪ [¶ 13] In *Newman* and *McGee,* we recognized that CBM is a mineral under Wyoming law. *Newman,* at ¶ 13, and those cases cited therein, and *McGee,* at ¶ 13. Nonetheless, like in *Newman* and *McGee,* this conclusion is not determinative because "minerals" may be both granted and reserved. We have further specifically noted that CBM is contained in or associated with coal, as CBM exists in coal in three basic states. *Newman,* at ¶¶ 9–10, and *McGee,* at ¶¶ 9 and 13. *In accord see Amoco Prod. Co. v. Southern Ute Indian Tribe,* 526 U.S. 865, 873, 119 S.Ct. 1719, 1724, 144 L.Ed.2d 22 (1999); *Carbon County v. Union Reserve Coal Co.,* 271 Mont. 459, 898 P.2d 680, 683 (1995); *United States Steel Corp. v. Hoge,* 503 Pa. 140, 468 A.2d 1380, 1382 (1983).

▪ 14] Furthermore, the language used in both the Scullen and Lynch deeds defines the additional minerals granted as *"all other* minerals, metallic *or nonmetallic."* This choice of verbiage is significant and cannot be disregarded because all parts of and every word in a contract should, if possible, be given effect. "We must avoid construing a contract so as to render one of its provisions meaningless, since each provision is presumed to have a purpose." *In re Estate of Corpening,* 2001 WY 18, ¶ 12, 19 P.3d 514, ¶ 12 (Wyo.2001); *see also Moncrief v. Louisiana Land & Exploration Co.,* 861 P.2d 516, 524 (Wyo.1993) and *Wyoming Game and Fish Comm'n v. Mills Co.,* 701 P.2d 819, 822 (Wyo.1985). Thus, it appears logical that the grantors involved in the Scullen and Lynch deeds may have intended to grant CBM to the grantees, as CBM is clearly a nonmetallic mineral.

[¶ 15] Importantly, in *McGee* the language of that deed forced us to determine whether CBM "may be mined and produced with coal." *McGee,* at ¶ 14. Similarly, it was necessary in *Newman* for us to determine whether or not CBM "may be mined or extracted in association" with coal or "in conjunction with coal mining operations." *Newman,* at ¶¶ 15–18. However, any such related determination is unnecessary as the grantors in the Scullen and Lynch deeds explicitly enumerated that the minerals granted were to be "all other minerals, metallic or nonmetallic, contained in or associated with the deposits of coal conveyed hereby *or* which may be mined and produced with said coal." As the language used within the applicable deeds is stated in the disjunctive, only one of the circumstances need be found. *Griess v. Office of the Attorney Gen., Div. of Criminal Investigation,* 932 P.2d 734, 738, (Wyo.1997) and those cases cited therein; *Olsten Staffing Services, Inc. v. D.A. Stinger Services, Inc.,* 921 P.2d 596, 600 (Wyo.1996). Thus, in this case, it makes no difference if the minerals granted "may be mined and produced with said coal," insofar as we have previously specifically held that CBM is contained in or associated with coal because

CBM exists in coal in three basic states.[2] *Newman*, at ¶¶ 9–10, and *McGee*, at ¶¶ 9 and 13.

[¶ 16] Appellees contend that CCC's argument is too simplistic and obsessively focuses on a single phrase found in the conveyance provisions of the Scullen and Lynch deeds while ignoring other language contained within the deeds. In particular, appellees point out that the phrase identified by CCC concludes with "subject to the reserved royalty hereinafter provided." Therefore, appellees argue that because the royalty provision of each deed states "GRANTOR reserves a royalty of three cents (3¢) per ton on all coal mined and sold, or removed," referring only to coal mined and sold and not gas or its removal, the parties to the deeds must have intended to convey only coal and not gas, namely CBM. Appellees further assert that the following language from the deeds bolsters their argument:

> [A]ll of the GRANTOR'S rights, easements, powers and privileges to enter upon said land to explore for, extract, mine and remove said coal by any method or means, whether now known or unknown, and whether by surface mining activities, by underground mining activities, or otherwise, it being the intent and purpose of this conveyance to convey from GRANTOR and vest in GRANTEE all of GRANTOR'S rights whatsoever, whenever obtained and by whatever means obtained, which relate to said coal, or the mining, extracting, removal or use of the same.

They additionally argue that these transactions were merely coal conveyances as evidenced by the title provision which states: "This is a deed conveying fee simple title to the coal in place, and is not a lease."

[¶ 17] We do not, however, find this argument persuasive. If appellees' argument is assumed correct, this would render an absolute nullity the clear language used within the granting clause of the subject deeds expressly conveying ownership of *all* metallic and nonmetallic minerals contained in or associated with deposits of coal or which may be mined and produced with coal. Indeed, the appellees' argument is even refuted by the testimony of their own expert, who opined that the deeds likely conveyed the metallic minerals of pyrite, marcasite, calcium carbonate, gold, and any other metallic mineral contained in or associated with the coal. Yet, the deeds do not carve out a per ton royalty for these other individual metallic minerals. Thus, the granting clause cannot reasonably be interpreted as conveying only those minerals upon which a per ton royalty is paid.

[¶ 18] Clearly, the words employed to convey ownership within the deeds serve a distinct purpose from those words explaining when royalties must be paid on the transferred coal. This distinction is highlighted by the fact that rights and privileges and intent and purpose provisions of the deeds do not require the grantees to immediately mine the coal or other minerals granted.[3] Rather, these clauses state that royalties become payable on the coal solely when mined and that the grantees have no obligation or responsibility to mine the coal or other minerals, if ever. Additionally, that same clause explicitly states that it is the intent and purpose of the conveyance "to convey from GRANTOR and vest in GRANTEE *all* of GRANTOR'S rights *whatsoever, whenever obtained and by whatever means obtained, which relate to said coal, or the mining, extracting, removal or use of the same.*" (Emphasis added.)

[¶ 19] We find that a more reasonable interpretation of the intent of the grantors expressed within the deeds is that the grantors simply intended to convey everything located within the coal seam. For appellees to now argue that the grantors actually in-

2. The grant language used in the Scullen and Lynch deeds and the grant language reviewed in *McGee* are exactly the same with the exception of the use of the disjunctive "or" as opposed to the conjunctive "and" respectively. This difference is very compelling.

3. The Scullen and Lynch deeds provide:

The royalty reservation herein contained shall not imply any obligation upon GRANTEE to commence the mining of coal within a reasonable time, nor at any time or at all, and shall not imply any obligation on GRANTEE to mine the coal continuously or at any particular rate, once mining is commenced.

tended the royalty provision to limit the scope of the grant, once it is discovered that CBM has substantial worth, is disingenuous.

[¶ 20] Moreover, in both *Newman* and *McGee* we interpreted the terms used within the documents at issue giving the words used their plain and ordinary meaning to reasonable persons at the same time and place of their use, namely, the early 1970s in the Fort Union formation of the Powder River Basin of Wyoming. *Newman,* at ¶¶ 15–18, and *McGee,* at ¶¶ 15–18. We recognized in *Hickman,* at ¶¶ 8–9:

> In *Newman* and *McGee,* we determined, after careful consideration of the historical development of the commercial capture of CBM, that those involved parties in 1973 and 1974 clearly could not have intended CBM to have been treated separately from oil and gas. We reached this conclusion in part because the value of CBM only became known long after the conveyance through the discovery of new methods for its capture and changes in economics making its collection profitable. Therefore, given the surrounding facts and circumstances which existed at the time of the execution of the warranty deeds in those cases, we concluded that the parties had no specific intent to convey rights in CBM separately from oil and gas because those granting parties would have been wholly unaware that CBM was of any value. Again, in the early 1970s, the separate production of CBM did not occur. Rather, CBM was then a useless waste by-product and possible hazard of coal excavation. *See Newman,* at ¶¶ 6–8; *McGee,* at ¶¶ 21–23.

Upon reviewing the language utilized in the conveyances made in *McGee,* this court noted the McGees expressly conveyed good and merchantable title to the lands involved "together with all coal and all other minerals, metallic or non-metallic, contained in or associated with coal and which may be produced with coal" owned or held by the grantors in those lands. These warranty deeds also reserved to the grantors "all oil, gas and other minerals in said lands" which the grantors then owned, "other than those included above in the

conveyance to Grantee." Applying the same reasoning as in *Newman,* we therefore concluded the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property. As we expressed in *Newman* at ¶ 32 (emphasis added):

> **On the basis of the unambiguous language of the deed and the surrounding facts and circumstances,** we conclude the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property.

[¶ 21] We conclude that the circumstances and conveyances that exist in this case are different and distinct from those reviewed by this court in *Newman* and *McGee.* Namely, in this case the grantors reserved no tangible mineral interest and chose to convey "all of GRANTOR'S undivided interest in and to the coal upon and within and underlying the following described lands situate in the County of Sheridan, State of Wyoming ... TOGETHER WITH all of GRANTOR'S UNDIVIDED interest in and to all other minerals, metallic or nonmetallic, contained in or associated with the deposits of coal conveyed hereby or which may be mined and produced with said coal, subject to the reserved royalty hereinafter provided." To the contrary in *Newman,* the warranty deed reserved to the grantor "all oil, gas and other minerals except as set forth above." *Newman,* at ¶ 3. Similarly, the deeds in *McGee* reserved "all oil, gas and other minerals in said lands which Grantor now owns, other than those included above in the conveyance to Grantee." *McGee,* at ¶ 24. This distinction is most critical in our conclusion that the predecessors of appellees did not intend to reserve an interest in any metallic and non-metallic minerals, including CBM, contained in or associated with deposits of the coal.

[¶ 22] Finally, we find that our ultimate holding in this case is directly in line

with our statements initially made in *Newman*. Specifically, our role is to give effect to the general intent of the parties to the conveyance with regard to the exploitation of the mineral resources governed by the language expressed in context with the specific facts and circumstances surrounding the execution of the transferring document on a case-by-case basis. *Newman,* ¶¶ 18, 27 and 32.

### CONCLUSION

[¶ 23]  We hold that the district court improperly determined that summary judgment should be granted in favor of the appellees. The record before us does not present issues of material fact, and the Scullen deed and Lynch deed are not ambiguous. Moreover, the undisputed facts in this case establish that appellees' predecessors intended to convey CBM to CCC's predecessors. Thus, CCC is entitled to summary judgment as a matter of law, rather than appellees.

[¶ 24]  We emphasize that, in interpreting contracts conveying mineral interests, the actual words used in each particular contract must be afforded the plain meaning that a reasonable person would give to them considering the contract as a whole, taking into account relationships between the various parts, and looking to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract with the goal of discerning the true intent of the parties. As a result, as the wording or underlying circumstances surrounding each mineral contract may vary, so may the ultimate conclusion vary on a case-by-case basis.

[¶ 25]  Reversed.