2012 WY 103

**BOWERS OIL AND GAS, INC.,**
a Colorado corporation,
Appellant (Plaintiff),

v.

**DCP DOUGLAS, LLC, a Colorado limited
liability company; and Kinder Morgan
Operating, L.P. "A", a Delaware limited
partnership, Appellees (Defendants).**

No. S–11–0233.

Supreme Court of Wyoming.

July 31, 2012.

Representing Appellant: Loyd E. Smith of Murane & Bostwick, LLC, Cheyenne, Wyoming.

Representing Appellees: James R. Belcher of Belcher & Boomgaarden, LLP, Cheyenne, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Bowers Oil and Gas, Inc. (BOG) entered into a Gas Purchase Contract with

Kinder Morgan Operating, L.P. (Kinder Morgan), pursuant to which Kinder Morgan agreed to purchase coal bed methane gas from certain of BOG's wells. Kinder Morgan transferred its interest in the Contract, and Kinder Morgan's successor eventually terminated the Contract pursuant to a provision that allowed either party to terminate if in the terminating party's sole opinion, the sale or purchase of the gas became unprofitable or uneconomical. BOG thereafter filed a complaint in district court asserting claims for breach of contract and breach of the covenant of good faith and fair dealing. Following a bench trial, the district court found no contract breach or covenant breach and ruled in favor of Kinder Morgan and its successor. We affirm.

### ISSUES

[¶ 2] BOG presents the following issues on appeal:

1. Whether the trial court erred in ruling that Appellees did not breach the Gas Purchase Contract?

A) Whether the trial court erred in ruling that Appellees were excused from performance of the Gas Purchase Contract on the basis that the Contract became uneconomical pursuant to paragraph 4 of the Contract?

2. Whether the trial court erred in ruling that the Appellees did not breach the covenant of good faith and fair dealing.

### FACTS

[¶ 3] BOG is an oil and gas developer with interests in a number of states, which interests include coal bed methane wells in Wyoming's Powder River Basin. On May 1, 2004, BOG entered into a Gas Purchase Contract with Kinder Morgan. Kinder Morgan is a provider of midstream services, including the gathering of gas from producers, and the processing and transporting of that gas to market. In 2004, Kinder Morgan owned the Douglas Gathering System, which is a system of collecting lines and main lines that runs from the Gillette area to a processing plant near Douglas, Wyoming. It was through a line connected to the Douglas Gathering System that Kinder Morgan was to accept BOG's coal bed methane gas.

[¶ 4] Pursuant to the Gas Purchase Contract, BOG agreed to sell gas produced from certain of its wells, and Kinder Morgan agreed to purchase the gas. The Contract made the parties' obligations subject to a number of conditions, including the following:

4. ECONOMIC CONDITIONS: In the event the gas delivered hereunder at any point or points becomes insufficient in volume, quality, pressure or for any reason becomes, in the sole opinion of Buyer or Seller, unprofitable or uneconomical for Buyer to purchase or for Seller to sell, then Buyer or Seller shall have the right to terminate this Contract upon thirty (30) days written notice to the other party as to any or as to all such points.

* * * *

7. QUANTITY OF GAS:

7.1. Buyer will purchase and take Seller's gas, subject to the demands of Buyer's resale purchaser(s) and the operating conditions and capacity of Buyer's facilities. It is understood that Buyer cannot guarantee the purchase of any particular quantity of Seller's gas which is available for sale. Buyer shall, however, endeavor to purchase gas from the lands covered by this Contract ratably with its purchases of similar gas under other contracts covering gas delivered to Buyer's facilities.

7.2. Seller shall have the right to dispose of any gas not taken by Buyer, subject to Buyer's right to resume purchase at any subsequent time upon thirty (30) days notice.

7.3. Seller shall have agents or employees available at all reasonable times to receive from Buyer's dispatchers advice and requests for changes in the rates of delivery of gas hereunder as required by Buyer from time to time.

* * * *

10. RESERVATIONS OF SELLER: Seller hereby expressly reserves unto itself, its successors and assigns, the following rights with respect to its interests in the gas properties committed by Seller to

Buyer hereunder together with sufficient gas produced to satisfy such rights:

10.1.  To operate Seller's gas properties free from any control by Buyer in such manner as Seller, in Seller's sole discretion, may deem advisable, including, without limitation the right, but never the obligation, to drill new wells, shut in wells, to repair and rework old wells, renew or extend, in whole or in part, any lease covering, in whole or in part, the gas properties and to abandon any well or surrender any such lease, in whole or in part, when no longer deemed by Seller to be capable of producing gas in paying quantities under normal methods of operation.

10.2.  To use gas produced from the gas properties for developing and operating Seller's gas properties committed hereto in the field in which the gas is produced, for the operation of Seller's pipelines, water stations, camps and other miscellaneous uses incident to the operation of such leases, for reinjection, and to fulfill obligations to Seller's Lessors therein.

[¶ 5]  All but one of BOG's wells were located on surface lands owned by the Antelope Coal Company (ACC), which operates the Antelope Coal Mine. Before entering into the Gas Purchase Contract with Kinder Morgan, BOG, on September 11, 2003, entered into a Surface Use Agreement with ACC. The Agreement contemplated ACC's planned expansion of its coal mine, which neighbored BOG's coal bed methane wells.  To accommodate the eventual coal mine expansion, the Surface Use Agreement contained provisions requiring BOG to shut in and abandon any well when ACC's surface disturbance approached within five hundred feet of that well.  Specifically, the Agreement provided:

13.) *Mining Notice:* As to each well drilled and related flow lines pursuant to this Agreement.

a.) OWNER shall give notice in writing to OPERATOR not less than ninety (90) days prior to the anticipated date by which OWNER'S coal surface mining or related operations shall be within One Thousand (1000) feet of an oil and/or gas well drilled by OPERATOR on the Surface Lands.

b.) OPERATOR agrees, at each such time as OWNER shall have mined and/or removed topsoil within Five Hundred (500) feet of such well site location, or to such other distance as may be permitted under the applicable regulations of governmental authorities having jurisdiction over the premises, but in no event later than such time as OWNER shall have mined with[in] Five Hundred (500) feet of such well site location, to suspend operations and to shut-in such well at OPERATOR'S expense and in connection therewith, to:

1.) Remove any and all of OPERATOR'S surface facilities, including pipelines, power lines and gathering lines located on Surface Lands at OPERATOR'S expense.  In the event that OPERATOR is required to shut-in a well and remove surface facilities, OPERATOR shall not have the right to require OWNER to purchase from the OPERATOR, the subject well, facilities and remaining recoverable oil, gas or coal bed methane reserves.

2.) Plug and abandon all wells to a depth below the coal seam being mined by OWNER.

3.) OWNER shall not be responsible for any loss of oil, coal bed methane or gas reserves due to mining operations by OWNER.

4.) Upon completion of such operations, OPERATOR shall give OWNER written notice thereof.

[¶ 6]  The Kinder Morgan pipeline that serviced BOG's wells was a ten-inch line that also ran through ACC lands.  Kinder Morgan held an easement for its pipeline known as the Litton Easement, which easement was granted and recorded earlier in time than ACC's coal leases on the same lands.  Kinder Morgan's sixteen-inch main line also ran through ACC lands.

[¶ 7]  In November 2004, BOG began producing and selling gas to Kinder Morgan.  In April 2006, Kinder Morgan sold its gas gathering and pipeline system to MEG Wyoming Gas Service, LLC (MEG) and assigned the BOG Gas Purchase Contract to MEG as part of that transaction.  BOG's last delivery of gas pursuant to the Contract occurred in July 2006.  In October 2006, BOG shut in its

wells because ACC had obtained approval to expand its coal mine and needed to perform work to divert the creek into which BOG was discharging water.

[¶ 8] During this same timeframe, ACC and MEG entered into negotiations for the relocation and decommissioning of portions of MEG's gathering lines and related facilities that were in the path of ACC's coal mine expansion. On September 25, 2006, ACC and MEG executed an agreement pursuant to which ACC agreed to pay MEG $10,640,163 for the relocation of its main sixteen-inch pipeline. In lieu of payment for relocating MEG's six-inch and ten-inch pipelines, MEG accepted a payment of $955,971 to remove those lines altogether.

[¶ 9] The removal of the ten-inch and six-inch pipelines cost MEG the ability to accept gas from certain producers in the area, including BOG. In a memorandum outlining the negotiated deal between MEG and ACC to MEG's management committee, MEG's vice president, Steven Huckaby, wrote, in part:

> Most of the oil and gas leases in the new coal development areas and the associated pipeline rights-of-way predate coal leases and have precedent. In general, law supports the efficient and economic development of all resources of the country. While precedence is recognized, when push comes to shove the industries must work together. In the case of this specific project, MEG's rights-of-way are superior to the coal leases and if Kennecott wants to develop its lease, it must pay us to move our pipelines. We can't say no and expect to prevail if the mine challenges us.
> * * * *
> This project contemplates that MEG will relocate our 16″ mainline and will remove various sections of 6″ and 10″ low pressure gathering system on a cost plus basis.
> The 6″ and 10″ gathering lines gather approximately 280 mcfd of conventional and 170 mcfd of CBM gas adjacent to or located in the mine expansion. The gross margin value of this lost gas would be approximately $0.4 million. The cost to replace the 6″ and 10″ gathering pipe would be $2.06 million. In lieu of replacing the gathering lines MEG will accept a $0.956 million payment, saving Kennecott $1.10 million. Net profit to MEG will be $0.556 million.
> * * * *
> All of the contracts for gas that would be affected by MEG's decision to take a payment in lieu of replacing the gathering lines have "gather's sole opinion" outs for uneconomic operations. When the contract with Kennecott is executed we will notify the producers that we intend to terminate their gathering contracts. We will give them the option to pay to have gathering lines or compression added to facilitate the reconnection of their gas. This may result in renegotiating contracts to include more favorable terms to the producer, but would also result in the recovery of a portion of MEG's lost income.

[¶ 10] Steven Huckaby testified that negotiations with ACC regarding the relocation and removal of its gathering lines were not easy, and he did not feel certain that MEG ultimately would have been able to negotiate full payment of the two million dollars required to relocate the six and ten-inch lines. Regarding the ability of MEG to insist that ACC pay to relocate the lines to which BOG was connected, Mr. Huckaby testified:

Q. If MEG's rights-of-way, as you state, were superior to the mine's leases, MEG would have had the right to insist that the mine pay the full price of relocating the feeder lines, correct?

A. They were responsible for paying to move our lines; that's right.

Q. . . . Had MEG insisted that Antelope Coal Mine pay the full cost of relocating those gathering lines, MEG would not have realized the .556 million profit that was anticipated in this deal, correct?

A. I would say that is not correct. The deal with Kennecott, the mine, was a negotiation. It was a process. We—we developed alternatives for moving that line. Some they liked; some they didn't. The concept of not replacing those lines with ten-inch and 6-inch, which were clearly way too large for the gas volume out there, didn't make sense to them or us.

Q. I don't think that answered my question. My questions was: If MEG, in the course of this agreement, had insisted that Antelope Coal Mine pay the cost of relocating those ten-inch and six-inch gathering lines, then MEG would not have realized the $.556 million profit?

A. I think we could insist, but it was a negotiation. We would get pushed back.

Q. You didn't answer my question. If you had insisted, you would have lost the profit, correct?

A. I might have lost the argument.

Q. If the coal mine had agreed to relocate the six-inch and ten-inch feeder lines instead of paying MEG in lieu of doing that, MEG would have lost the profit it got out of the deal?

A. Yes.

[¶ 11] Steven Huckaby also provided testimony concerning the economic justification for the line removal referenced in his memorandum to MEG's management committee. He testified:

Q. (By Mr. Belcher) So for the court's benefit, explain the economic decision you made that refers to the economic opt out [th]at your memo, which I think Exhibit 29 [is] discussing.

A. To do that, you would go to section four of the economic conditions, and, you know, we looked at the economics of spending the $2 million versus a $400,000 loss of the gross margin on that, and it—as it says, in our opinion, we did not find that to be economic.

Q. Just in simple terms, explain to the court what you looked at to make that determination.

A. Had we done that deal, spent $2 million putting that pipeline in, all we could expect is to recover $400,000 over time. If all things stayed equal, if those wells continued to produce, or we had the opportunity here to capture $956,000 immediately. So, a really big bird in the hand versus, you know, taking that economic risk over time. I mean, it was a slam-dunk economic decision.

Q. And what was the economic decision?

A. To take the 956,000 today versus the 400,000 tomorrow. And at the time we did the deal, you know, I really felt like we would find that solution to recover some of the 400,000 that we were foregoing, which would have just been gravy on top of the deal.

[¶ 12] In early 2007, ACC notified BOG that it had completed its diversion work. In the spring of 2007, BOG contacted MEG and informed it that BOG's wells were back on line and requested that it be reconnected to MEG's lines. MEG then informed BOG that the lines had been decommissioned and would not be available to BOG. Steven Huckaby testified that MEG was surprised to hear from BOG because it had assumed BOG's wells were permanently shut-in because of the coal mine expansion. Mr. Huckaby testified that in response to the contact from BOG, MEG began exploring options for reconnecting BOG.

Q. Now, there has been a lot of discussion about what MEG did or didn't do to try and reconnect the Bowers wells. What was the economic incentive of MEG or another company in the midstream business to connect a gas producer?

A. We are still in the business. We don't make a living off of moving lines. We make a living using those lines to gather gas. And when we determined in March of Mr. Bowers' notice that they were coming back up, we got busy in earnest trying to figure out how to do that. I always felt there was an answer out there, and engineering started working on it. Now, this project had to stand in a cue of priorities by engineering, so it might have taken a little longer to get that out of engineering than some of the higher priority projects they were working on, but it was being worked on. And then the transaction between MEG and DCP started to occur, and we got wrapped up in that. And I—I was quite involved in that, so I didn't—we didn't get to complete with Mr. Bowers. It was handed over to DCP in the transition.

[¶ 13] On August 8, 2007, BOG sent a letter to MEG demanding that it be recon-

nected to MEG's gathering system. The letter stated:

> In April, 2007 Momentum Energy Group removed a segment of the pipeline which transported natural gas from the wells covered by the above captioned contract.
>
> Since that time we have contacted Momentum personnel on many occasions in an effort to connect the wells to another pipeline. Momentum consistently informed us we would be "connected soon", however, to date we continue to be shut-in.
>
> This letter is intended to provide you notice that if we aren't connected to the line whereby we can resume production within two weeks we will consider you in breach of this contract.

[¶ 14] On August 29, 2007, MEG was acquired by DCP Midstream, LLC and was renamed DCP Douglas, LLC (DCP). DCP's managing director Tim Christensen testified that after DCP acquired MEG, he was assigned responsibility for what he termed the "stranded gas" issue, referring to the task of finding a way to reconnect producers with whom MEG, and then DCP, had gas purchase contracts. Between September 2007 and the spring of 2008, DCP researched and ran calculations trying to find an economical way to make the connections. In the spring of 2008, DCP ran some tests on its main line and suffered a rupture in the line. Diagnostics and repairs of the main line continued into March 2009.

[¶ 15] On August 7, 2008, BOG, through its attorney, sent a letter to DCP and Kinder Morgan demanding damages for breach of contract in the amount of $1,736,157. On November 19, 2008, DCP notified BOG that DCP was terminating its Gas Purchase Contract with BOG. The letter stated, in part:

> DCP Douglas, which became the owner of the gathering system in August 2007, has since concluded that economic conditions and the quality of gas produced from Bowers Oil & Gas wells make it uneconomical for DCP Douglas to resume purchasing gas from those wells. Consequently, this letter constitutes notice of termination, effective December 17, 2008, pursuant to Paragraph 4 of the May 1, 2004 Gas Purchase Contract ("Contract") between Bowers Oil and Gas, Inc. and Kinder Morgan Operating L.P., the original party from which DCP Douglas' interest in the contract was derived.

[¶ 16] Tim Christensen testified that DCP spent approximately fifteen to twenty million dollars repairing its main line and approximately $50,000 pursuing a right-of-way and obtaining cost estimates for reconnection to the producers. Concerning DCP's decision to abandon its efforts to capture the stranded gas and to terminate the BOG Contract, Mr. Christensen testified:

> Q. If you can, would you talk about where the stranded gas project was during this period from the spring of 2008 until you terminated the contract?
>
> A. Yeah, we basically didn't work on it a whole lot once the pipeline failure happened. I will say, you know, I talked to a couple of the producers that were affected, but I never talked to Mr. Bowers until he sent his demand letter in—I believe it was August 2008. I never had talked to the Bowers' entity at all prior to that.
>
> * * * *
>
> Q. Okay, so let's go back now to your considering what I'm going to call option two. What was the result of those efforts?
>
> A. It was in the fall of 2008, we had actually reached agreement with EOG to connect one of their wells, and we made that agreement contingent upon working out a deal with the stranded gas producers, particularly the Bowers.
>
> At that point in time, I called Mr. Bowers to see if he would consider releasing the claims he had against us, if we were to reconnect his gas, and he told me that it was in the hands of the attorneys. So I took that as a no, and we then actually went back to EOG and released the well we had contingently put—put—reached a deal on. We went back to them and released the well. We did not connect that well.
>
> Q. What did you end up doing as it relates to the wells after that?
>
> A. The fact that he said he wouldn't release the claims, I saw no possible economic way to connect them, if you consider

that we had the claims in addition to the connection costs. So we ceased working on the stranded gas at that time.

Q. And what did you do with respect to the Bowers wells?

A. After my conversation with Mr. Bowers, I prepared a termination letter and sent it out.

[¶ 17] On June 1, 2009, BOG filed a Complaint against DCP and Kinder Morgan, alleging claims for breach of contract and breach of the covenant of good faith and fair dealing. The case was tried to the district court without a jury on January 24, 2011, to January 26, 2011, and on April 15, 2011, the district court issued its decision. The district court ruled that DCP had legally terminated the Contract and, on the question of the covenant of good faith and fair dealing, ruled:

Since DCP acted in accordance with the contract and made good faith efforts to look for alternatives to continue to purchase BOG gas, I can not find a breach of the covenant of good faith. Let me reiterate that I believe that all parties were subject to the actions of the mine. Given that circumstance, it is difficult to find breach of the covenant of good faith.

## STANDARD OF REVIEW

[¶ 18] Because BOG's claims were tried to the court, we apply the following standard of review:

Following a bench trial, this court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan*, 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Piroschak*, ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004). Further,

we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Id.*

*Pennant Service Co., Inc. v. True Oil Co., LLC*, 2011 WY 40, ¶ 7, 249 P.3d 698, 703 (Wyo.2011) (quoting *Hofstad v. Christie*, 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010)) (some citations omitted). We review the district court's conclusions of law *de novo*. *Claman v. Popp*, 2012 WY 92, ¶ 22, 279 P.3d 1003, 1012 (Wyo.2012); *Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009).

## DISCUSSION

### A. Breach of Contract Claim

[¶ 19] BOG contends that the Gas Purchase Contract obligated Kinder Morgan/DCP to maintain the pipeline connection with BOG and, assuming an available market and no systems failure, to then purchase the gas BOG produced. In other words, BOG argues that Kinder Morgan/DCP could not voluntarily decommission its pipeline and then terminate the Contract because the decommissioned line made the purchase of gas uneconomical. Based on this premise, BOG argues that the district court erred in finding no breach of the Gas Purchase Contract.

[¶ 20] Interpretation of a contract is a question of law. *Union Pacific Railroad Co. v. Caballo Coal Co.*, 2011 WY 24, ¶ 13, 246 P.3d 867, 871 (Wyo.2011). We

begin our analysis with our rules of contract interpretation, the most basic of which mandates that a contract's plain language is controlling. *Claman,* ¶ 26, 279 P.3d at 1013; *Hunter v. Reece,* 2011 WY 97, ¶ 17, 253 P.3d 497, 501–02 (Wyo.2011).

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co. [v. Texaco* ], 882 P.2d [212,] 220 [ (Wyo.1994) ]; *Prudential Preferred Properties [v. J and J Ventures],* 859 P.2d [1267,] 1271 [ (Wyo.1993) ]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.,* 929 P.2d 535, 539 (Wyo.1996).

*Claman,* ¶ 26, 279 P.3d at 1013 (quoting *Hunter,* ¶ 17, 253 P.3d at 502) (alterations in original). Our rules of interpretation further require that we interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning. *State ex rel. Arnold v. Ommen,* 2009 WY 24, ¶ 40, 201 P.3d 1127, 1138 (Wyo.2009); *see also Caballo Coal Co. v. Fid. Exploration & Prod. Co.,* 2004 WY 6, ¶ 11, 84 P.3d 311, 314–15 (Wyo.2004).

[¶ 21] Citing economic reasons, DCP terminated the Gas Purchase Contract pursuant to Paragraph 4 of the Contract. Paragraph 4 allowed either party, in this case DCP as Buyer, to terminate the Contract, if, in the sole opinion of that terminating party, it became uneconomical to purchase the gas. Neither party suggests that Paragraph 4, or any part of the Contract, is ambiguous, and in our review, we find no ambiguity.

[¶ 22] Having concluded that the Contract is clear and unambiguous, we look then to the plain meaning of the Contract's terms. The language that first must be considered is the term "uneconomical." "Uneconomical" is defined to mean "not economically practicable; costly, wasteful." *Merriam–Webster's Collegiate Dictionary* 1366 (11th ed. 2007).

[¶ 23] When MEG owned the feeder pipelines that connected BOG to the gathering system, it made the economic decision to remove the feeder lines rather than attempt to force ACC to pay the costs of relocating the line. MEG made that decision as the coal mine was expanding and at a time when BOG's wells were shut in, and the economic reasons it cited were: 1) the calculated cost of relocating the feeder pipelines was two million dollars and the anticipated future revenue from that pipeline was only $400,000; 2) the feeder lines were larger than necessary for the volume of gas they were transporting; 3) removal of the feeder lines would result in a guaranteed immediate profit of $556,000 in contrast with the relocation which would result in a possible but not guaranteed profit of $400,000 over time; and 4) MEG hoped to find other economical ways to connect and continue to purchase gas from producers.[1]

[¶ 24] We can find no clear error in the district court's finding that these circumstances warranted MEG's determination that it was uneconomical, that is, costly, wasteful and impracticable, to demand relocation of its feeder pipelines rather than accepting payment for removal of the pipelines. We conclude likewise with respect to DCP's ultimate decision to terminate the Contract. DCP had spent millions of dollars trying to repair its main line, thousands of dollars trying to find an economical way to reconnect the pro-

---

1. We understand that MEG's decision to remove the feeder lines was not a direct decision to terminate the Contract and thus arguably was not subject to the question of whether the situation's economics supported the decision. The question of whether MEG's decision to remove the line breached the Contract is not an economic question, but instead depends on whether the Contract obligated MEG and its successor to maintain the feeder lines and connection to BOG's facilities. We will discuss that question below. We include the economic basis for MEG's decisions regarding the line removal because DCP inherited those decisions as part of its own economic analysis. We thus find the analysis of MEG's economic considerations helpful in determining whether DCP was economically justified in its decision to terminate the Gas Purchase Contract.

ducers with whom it had contracts, and was faced with a nearly two million dollar claim by BOG. Under these circumstances, we can find no clear error in upholding DCP's termination of the Contract because, in DCP's *sole opinion,* it was no longer economical to purchase the gas.

[¶ 25] We turn next to BOG's arguments that MEG and its successor could not rely on an economic basis to terminate the Contract, because MEG's own actions caused the economic issue. BOG contends that MEG had a right under its superior easement, which was prior in time to the coal mine's permits, to demand that the coal mine relocate the lines, whatever the cost. BOG's argument continues, that having voluntarily relinquished its right to have the line relocated and connected to the producers, MEG could not then claim it was uneconomical to purchase the gas.

[¶ 26] The flaw in BOG's argument is its premise that the Gas Purchase Contract obligated MEG to keep and maintain its connection to BOG for the entire term of the Contract. That obligation cannot be found in the Contract, and in fact, the Contract provides each party with authority and control over its facilities.

[¶ 27] Pursuant to Paragraph 10 of the Contract, BOG, as the Seller, was permitted full authority over its facilities and operations, and full authority and discretion to decide whether it would even produce gas. Likewise, pursuant to Paragraph 7 of the Contract, MEG, as the Buyer, was permitted to condition its purchases of gas on market demands and "the operating conditions and capacity of Buyer's facilities." The next sentence of Paragraph 7 follows with the parties' express understanding that "Buyer cannot guarantee the purchase of any particular quantity of Seller's gas which is available for sale." Read as a whole, the Contract was simply not one of guarantees. The Contract did not guarantee that gas would always be flowing, that gas would always be purchased, or even that the facilities would be present and available to purchase the gas.

[¶ 28] Based on the foregoing, we find no breach of contract in MEG's decision, inherited by DCP, to remove rather than relocate its feeder pipelines, and we find DCP properly terminated the Contract in accordance with the Paragraph 4 provisions.

**B. Covenant of Good Faith and Fair Dealing**

[¶ 29] This Court has recognized that commercial contracts contain an implied covenant of good faith and fair dealing. *Ultra Res., Inc. v. Hartman,* 2010 WY 36, ¶ 84, 226 P.3d 889, 919 (Wyo.2010).

> Restatement (Second) of Contracts § 205 (1981) states the general principle: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." We have determined that "the implied covenant requires that neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement." *City of Gillette v. Hladky Constr., Inc.,* 2008 WY 134, ¶ 30, 196 P.3d 184, 196 (Wyo.2008). A party breaches the covenant by interfering or failing to cooperate in the other party's performance under the contract. [*Scherer Constr., LLC v. Hedquist Constr., Inc.,* 2001 WY 23, ¶ 19, 18 P.3d 645, 653 (Wyo. 2001)].

*Ultra Res.,* ¶ 84, 226 P.3d at 919.

[¶ 30] The covenant of good faith and fair dealing requires that each party's actions be consistent with the agreed common purpose and justified expectations of the other party. *Grommet v. Newman,* 2009 WY 150, ¶ 25, 220 P.3d 795, 804 (Wyo.2009). Those purposes and expectations are defined by reference to the contract language, the parties' course of dealing, and the parties' conduct. *Hladky Constr.,* ¶ 31, 196 P.3d at 196.

[¶ 31] BOG contends that DCP/MEG violated the covenant of good faith and fair dealing when it agreed to accept payment for removal of its feeder lines, in lieu of demanding that the lines be relocated. BOG characterizes this as a "sweet deal" for DCP/MEG and argues that DCP/MEG intended to "get away" with the deal by relying on Paragraph 4 of the Contract. BOG casts the deal

between MEG and ACC in a nefarious light, and contends that MEG's decommissioning of the feeder lines undermined BOG's justified contract expectations.

[¶ 32] The district court viewed the evidence differently, finding, in relevant part:

The Plaintiff argues persuasively that the contract became uneconomical because the Defendant, DCP, made a side agreement with ACC to decommission the gathering system for a money payment. . . .

However, after giving this matter much consideration and despite the excellent presentation by Plaintiff's counsel, I must disagree with that analysis.

In fact, there was another player in this matter, an undeniable "elephant in the room." That of course was Antelope Coal Company. Everything in this case, did, and likely always would have been controlled by the economic needs of the mine.

ACC was the surface owner of much of the property in question. ACC had a [surface] agreement that required BOG to cease operations on any of the BOG's wells when the mine came within five hundred (500) feet of the wells.

. . . It is also clear that ACC was expanding its mine site.

Most telling is that BOG shut off its gas well operations in the fall of 2006 for six months in deference to the mine relocating the creek drainage.

I must find and conclude that the actions of ACC regarding the expansion of the mine were the precipitating factor that caused the gas contract to fail. It is clear to the Court that all of the activities in the vicinity of the gas wells would, to varying degrees, be subject to the plans of ACC.

BOG and the mine agreed that the wells and naturally the gathering lines would be shut down when the mine expanded near the wells. Thus, BOG could not reasonably expect DCP to keep the lines intact and operating when they would interfere with the mine.

\* \* \* \*

DCP, if it had constructed a new gathering system, had no guarantee from anyone that it would ever receive enough gas to recover its capital costs.

On the other hand, by abandoning the gathering system due to the mine expansion, DCP gave up an asset. Therefore, it was reasonable for DCP to reach a settlement with the mine.

DCP, after August of 2007, made good faith efforts to determine if it was feasible to continue to buy gas from BOG. These efforts were ongoing until November of 2008, when DCP ultimately cancelled the contract.

\* \* \* \*

Since DCP acted in accordance with the contract and made good faith efforts to look for alternatives to continue to purchase BOG gas, I can not find a breach of the covenant of good faith. Let me reiterate that I believe that all parties were subject to the actions of the mine. Given that circumstance, it is difficult to find breach of the covenant of good faith.

[¶ 33] BOG's argument on appeal does not suggest that the district court's findings are not supported by the evidence. Instead, what BOG urges is a different interpretation of the evidence. We find that the evidence supports the district court's findings and reject BOG's interpretation of the evidence. BOG's apparent expectation that MEG/DCP would maintain a line and connection to BOG at any cost was unjustified, not only in light of the coal mine's expansion and BOG's obligations to ACC, but also in light of the Contract terms and the parties' course of conduct. As discussed above, the Contract contained no guarantees that gas would be produced or purchased, and indeed, BOG shut in its wells for six months, and the record shows it had not produced for two months before that, with no consequence under the Contract.

[¶ 34] We can find no clear error in the district court's ruling on BOG's breach of the implied covenant and fair dealing claim.

### CONCLUSION

[¶ 35] We find no breach of contract in MEG's removal of the pipelines connecting BOG to the gas gathering system and that

DCP properly terminated the Gas Purchase Contract for economic cause. We further find no clear error in the district court's rejection of BOG's claim for breach of the implied covenant and fair dealing.